WILLIAM F. BURKE AND EDMUND B. HOURIGAN, AS CO-PARTNERS, *ETC.*, PLAINTIFFS-RESPONDENTS, v. FREDERICK R. HOFFMAN, DEFENDANT-APPELLANT, AND BERNARD J. BERGTON, *ETC.*, DEFENDANT-RESPONDENT.

Argued November 5, 1958—Decided December 22, 1958.

Mr. *Edward F. Merrey, Jr.*, argued the cause for the appellant (*Messrs. Merrey & Merrey*, attorneys).

Mr. *Theodore W. Trautwein* argued the cause for the defendant respondent (*Mr. Warren Dixon, Jr.*, attorney).

The opinion of the court was delivered by

HEHER, J.   The controversy here concerns rival claims to a fund of $2,450, a part of the purchase price of certain dwelling houses retained and held in escrow by the plaintiff attorneys at law awaiting a determination of the issues. The proceeding has been treated as one of interpleader, although the fund remains, by agreement of the parties at the title closing, in the possession of the plaintiffs until adjudication is had.

The claimants are the defendant appellant Hoffman and the defendant respondent Bergton; the former's claim is that the fund should be his for the reduction of mechanics' liens on the real property thus transferred at the time of its conveyance to him by the trustee in bankruptcy of Franmar Realty Co., Inc., and the latter's demand is founded on what is said to be an assignment by Franmar of sufficient of the purchase price of the given real property to satisfy brokerage commissions due Bergton for negotiating, on behalf of Franmar, the sales of the houses to Hoffman's grantees, of which more anon.

There was summary judgment awarding the fund to Bergton; and the case is here by our certification, *sua sponte*, of Hoffman's appeal to the Appellate Division.

On June 28, 1955 Franmar, then the owner of eight contiguous lots on Iris Court in Teaneck, New Jersey, made a written grant to Bergton of an "exclusive agency" for the sale of the several lots and the houses to be built thereon at a stipulated price, or such other price as might later be agreeable to Franmar, and agreed to pay him a commission of $350 "per house, payable at closing of title." Bergton

negotiated sales of seven of the eight houses; and the contracts of sale severally provided that the "owner/seller ["the undersigned owner" in some] of the herein described premises recognizes [the respondent] Bergton as the broker negotiating this agreement and agrees to pay and hereby assigns to him a commission as per agreement previously entered into by said parties."

In each case the vendee gave Franmar a deposit on the house when the contract of sale was delivered; and the balance of the purchase price was made payable upon the completion of the house. The Commonwealth Trust Company had issued commitments to take from the several purchasers mortgages to be guaranteed by the Veterans Administration.

Franmar proceeded with the construction work. On July 1, 1955 it mortgaged the lots to Jacob Moskow to secure $43,000; on December 28, 1955 it mortgaged the lots and other lands to Midland Park Lumber and Supply Co., Inc., to secure $26,966.73; and on December 29, 1955 it again mortgaged the lots to Underwriters Trust Co. to secure $72,000. Moskow and Midland subordinated their respective mortgages to Underwriters' mortgage. During November and December 1955 Midland filed in the office of the county clerk, as to each of the eight lots, a mechanic's notice of intention to perform labor and furnish materials; and on January 4, 1957 it filed a mechanic's lien claim as to each lot. Meantime, January 2, 1957, Underwriters brought suit to foreclose its mortgage; Moskow and Midland and the several purchasers of the eight lots were made parties defendant to the proceeding. On December 31, 1956 seven of the eight vendees recorded their contracts in the office of the county clerk. On January 21, 1957 Franmar was adjudicated a bankrupt in the United States District Court for the District of New Jersey, in an involuntary proceeding; and on June 14, 1957 Hoffman purchased from Franmar's trustee in bankruptcy his right, title and interest in all of the bankrupt's real property, including the eight lots made the subject of the several contracts of sale. The

trustee's conveyance of the lots in question to Hoffman was made subject to Underwriters' first mortgage; also Moskow's and Midland's mortgages; "eight separate mechanics' lien claims filed" by Midland, each recorded January 4, 1957 in the county clerk's office; taxes and assessments, if any; and subject also to the "rights of any purchasers * * * under contract to acquire each of the eight houses erected on the * * * eight lots * * * whether same were recorded or not recorded, or whether said contract purchasers are in or out of possession."

As indicated, Hoffman complied with demands made by the several vendees for a conveyance of their respective parcels. It is said that while Hoffman was obliged to convey to the contract purchasers, they were not under a duty to complete the purchase. Be that as it may, the closings were had under plaintiffs' professional supervision; and it was then, we are told, that Hoffman was first apprized of Bergton's claim for commissions. The plaintiffs insisted upon "withholding $350 from the purchase price of seven of the eight lots." Bergton did not effect the sale of the eighth lot.

To "consummate the closings so as to stop taxes and interest charges on the encumbrances prior to the mechanics' liens," it is affirmed, Hoffman "supplied to plaintiffs warrants for satisfaction of each of the mechanic's liens"; the warrants "were furnished him by the lienor conditional on payment to the extent of the purchase price after prior lien"; and the "commission money was to be held by plaintiffs in escrow pending the determination as to the validity of Bergton's claim"; the "remainder of the purchase price was devoted to the payment of taxes, assessments for improvements, the three mortgages and mechanics' liens in the order of their priority," and "[a]s a result of such withholdings [Midland's] mechanic's liens were not paid in full"; there "was a deficiency of $9,296.08 on the lien claims"; and thus there would still be a deficiency were the fund held in escrow applied to the lien claims.

The respondent Bergton's case is made to rest upon an "equitable assignment," *pro tanto,* of the "fund created by

the agreement to purchase," citing *Structural Gypsum Corp. v. National Commercial Title, etc., Co.,* 107 *N. J. Eq.* 32, 40 (*E. & A.* 1930), that is to say, "a part of [the] debt * * * to be paid by purchaser to seller on conveyance of title or as the contract may require"; the assignment, it is argued, "being a part of the contract [of sale] could have no reference to any other fund and clearly was applicable and applied to the fund created by the agreement to purchase"; and since "Bergton had completed his services as broker on the seven houses prior to August 27, 1955," the "assignments were effective as of that time, although performable later," and so "Bergton held, not a lien against the land, but an assignment of a part of the fund constituting the purchase price"; his claim "was not against the land but arose from an assignment of a part of the purchase price." Recognizing that "the words 'being a part of the obligation of the purchaser under this contract' were not used" here, it is urged that "inasmuch as the assignment was incorporated in and a part of the contract to purchase itself, this was a sufficient designation and constituted notice to the debtor of the assignment," having in view the principle of *Structural Gypsum, supra,* that "[a]ny order, writing or act which clearly indicates that the assignor intended to make over a fund belonging to him, amounts in equity to an assignment of the fund."

And the insistence is that the cancellation of the mortgages and mechanics' liens, termed the "voluntary decision" of the holders of the liens, did not *"ipso facto* by some magic legal transmutation give them a lien against the fund constituting the purchase price"; and if "it could have had any such result on any conceivable theory such transmutation could not have created a right senior to Bergton's assignments, for * * * all liens against the lands were subsequent thereto, and could not have created a right prior to the right of the purchasers to be protected from the consequence of the assignment to Bergton by virtue of the provisions of their respective contracts."

But the premises are insufficient; the conclusion is a *non sequitur*. The reasoning holds the seed of its own refutation; it is lacking in "logical core," as it is sometimes put. The subject of the assignment was at most the purchase price to grow due to the vendor under the contract on the completion of the house and conveyance of the house and lot free and clear of mortgage liens and encumbrances and mechanics' liens for labor performed and materials furnished in the construction of the house. Such is in essence the meaning of the assignment. The owner agreed "to pay" and thereby "assign[ed]" to the broker a commission for the sales service, "payable at closing of title," of which more hereafter. Compare *Seyfried v. Stoll,* 56 *N. J. Eq.* 187 (*Ch.* 1897). The assignment would be operative in equity only upon the balance of the stipulated purchase price payable by the vendee to the vendor upon the consummation of the contract of sale, according to its terms, the debt then due to the vendor; and, as we have seen, the expectancy did not come into being, and there was no fund to which the assignment could attach. In each case the liens upon the house and lot exhausted the purchase price; the fund in suit is not sufficient to satisfy the balance due on the liens then of record. It is to be said in passing that the appellant Hoffman was an executive officer of Midland and it was suggested on the oral argument that he acted in its behalf in taking title to the real property from Franmar's trustee in bankruptcy. But however this may be, no fund materialized upon which the assignment could operate.

The respondent Bergton invokes the principle expounded in *Structural Gypsum, supra:* "An assignment, for a valuable consideration, of a sum of money due, or to grow due, on the performance of an existing contract will, on notice thereof being given to the debtor, operate as an equitable assignment of so much of the fund as is covered thereby, subject to all valid prior charges"; and "[o]n notice of the assignment being given to the debtor, and the possible debt ripening into an enforceable money liability, equity vests

the equitable title *pro tanto* of the fund in the assignee, of whom the debtor becomes the trustee or *quasi*-trustee as to the amount assigned, subject to existing equities."

■■ The fact that the money is not due is the ordinary case of an equitable assignment. An equitable assignment of "money to be earned" becomes operative "upon the fund as soon as it [is] earned." *Cogan v. Conover Manufacturing Co.*, 69 *N. J. Eq.* 809 (*E. & A.* 1905); *Bank of Harlem v. Bayonne*, 48 *N. J. Eq.* 246 (*Ch.* 1891), affirmed *Ibid.* 48 *N. J. Eq.* 646 (*E. & A.* 1891); *Bower v. Hadden Blue Stone Co.*, 30 *N. J. Eq.* 171 (*Ch.* 1878), affirmed *sub nom. Lyon v. Bower, Ibid.* 30 *N. J. Eq.* 340 (*E. & A.* 1878); *Terney v. Wilson*, 45 *N. J. L.* 282 (*Sup. Ct.* 1883). There could not be in the nature of things a positive lien or charge upon a fund not *in esse.* And even when the fund comes into being the doctrine of equitable assignment involves the exercise of a sound discretion, according to the principles of equity and essential justice in the particular circumstances and the requirements of positive law and sound public policy. Compare *Market Holding Co. v. North Camden Trust Co.*, 123 *N. J. Eq.* 328 (*E. & A.* 1938).

Here, the assignment concerned a potential "fund" that did not materialize; and there is no conceivable equity in favor of the broker as against the holders of record liens for moneys loaned and labor performed and materials provided for the construction of the houses without which the subject of the brokerage services would not have come into existence. Such was plainly the common intention of the parties to the brokerage contract. Any other view of the mutual understanding would ignore the nature of the subject matter and the circumstances attending the making of the bargain. It would be contrary to equity and good conscience were the broker accorded priority over the very liens that made construction possible.

■■ Where there are equal equities, the first in order of time shall prevail; and where there is equal equity, the law must prevail. The first of these equitable maxims means that as between persons having only equitable interests, if

their interests are in all other respects equal, "priority in time gives the better equity, * * *." *Pomeroy's Equity Jurisprudence* (*5th ed.*), § 678. But the principle itself is not absolute; it prevails only where "the successive equitable interests are equal; indeed, the equity resulting *merely* from priority in time has been said to be the feeblest of any, and to be resorted to only when there is no other feature or incident of superiority," the "superior equity" that will disturb the order of time. *Ibid.* § 707; also § 714.

A mortgage debt, although a chose in action, is yet, where the subject of the security is land, "an interest in land," and priorities are governed by the rules applicable to interests in land, and not by the rules which govern interests in personalty. *Pomeroy, Ibid.,* § 697. See also § 712. And Midland's claim constituted a lien under the Mechanics' Lien Law. *N. J. S. 2A*:44–64 *et seq.* In equity, Midland's lien is deemed to have been transferred to the fund. Cancellation was not designed to be a surrender of the right to priority under the lien; it was done to permit the closing and thus to ward off interest charges and other adverse consequences of further delay; the issue remained to be determined in this proceeding without any sacrifice of essential right.

The judgment is accordingly reversed; and the cause is remanded for the entry of judgment in favor of the defendant appellant.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For affirmance*—None.