In the Matter of **FADER MOTOR COMPANY, a Delaware corporation.**

Court of Chancery of Delaware.

New Castle.

July 19, 1968.

Richard J. Abrams, of Richards, Layton & Finger, Wilmington, for the estate of A. Franklin Fader.

F. Alton Tybout, of Tybout & Redfearn, Wilmington, pro se receiver of Fader Motor Co.

DUFFY, Chancellor:

This is the decision on the merits of a claim filed by the Estate of A. Franklin Fader ("Estate") against the Receiver of Fader Motor Co., a Delaware corporation ("Receiver"). The Estate, as subrogee of Universal C.I.T. Credit Corporation ("C.I.T."), seeks, *inter alia*, an adjudication that it had a lien on certain funds owed to Fader Motor Co. ("Fader Co.") by the Ford Motor Company ("Ford"), and that the lien arose prior-to appointment of the Receiver. The Receiver has objected to the claim.

The Estate claims a lien based upon an agreement between C.I.T. and Fader Co. executed in 1962. That agreement, called a "Dealer's Application for Floor Plan Credit," provided for a line of credit by C.I.T. to Fader Co. It gave C.I.T. a security interest in certain merchandise and other items owned by Fader Co., and stated that Fader Co.

> "assign[s] to you [C.I.T.] all *monies now or hereafter payable to us* [*Fader*] *by the factory* [*Ford*] * * * *to the extent of our obligations to you.* We authorize you to disclose such assignment to the factory * * * or to make direct collection of the sums involved, and we will hold in trust and immediately remit to you any amounts collected by us, and you will credit us with all sums received by you." [Emphasis supplied.]

It is undisputed that this amounts to a valid assignment of funds by Fader Co. to C.I.T. What is disputed is whether the assignment or lien attached to certain moneys owed by Ford to Fader Co. and/or to the Receiver after his appointment. If

the lien attached to such property prior to the appointment, then the Receiver took title to the property subject to the lien. 10 Del.C. § 7373; [1] James Bradford Co. v. United Leather Co., 1915, 11 Del.Ch. 76, 97 A. 620 and 97 A. 622; 75 C.J.S. Receivers §§ 112, 128. On the other hand, the lien could not attach after the Receiver was appointed because on that date title to Fader Co. assets vested in the Receiver by operation of law. 8 Del.C. § 292; [2] Ferris v. Chic-Mint Gum Co., 1924, 14 Del.Ch. 270, 125 A. 343.

The moneys and credits which are the subject of the claim arose in part out of a "Dealer's Agreement" between Fader Co. and C.I.T. made in 1962. Paragraph 21 of the agreement provides that:

> "Upon termination of this agreement by the Company, or upon expiration of this agreement and failure by the Company to renew it or to execute a new agreement with the Dealer the Company in the event the Dealer shall so elect * * * shall purchase or accept upon return from the Dealer and the Dealer shall sell or return to the Company and upon termination of this agreement by the Dealer or expiration of this agreement and failure by the Dealer to renew it or to execute a new agreement with the Company, the Company shall have the option to purchase or reacquire from the Dealer:

> 21. (a) * * * Each unused and undamaged vehicle * * * in the Dealer's stock and unsold by the Dealer on the effective date of such termination or expiration * * *

---

1. 10 Del.C. § 7373 provides as follows:
 "No proceeding under * * * [subchapters relating to insolvency] shall in any way impair the lien of any mortgage, judgment, recognizance, execution, or any other lien, or the liability of one who, as surety, joint debtor, or otherwise, is liable for a debt or demand existing against the person to whom such proceeding relates."

2. 8 Del.C. § 292 provides in part:
 "Trustees or receivers appointed by the Court of Chancery of and for any corporation, * * * shall, upon their appointment and qualification * * *, be vested by operation of law and without any act or deed, with the title of the corporation to all of its property, * * * *."

(b) * * * (i) Each new, unused and undamaged part in the Dealer's stock and unsold by the Dealer, * *

(ii) Each new, unused and undamaged accessory, * * *

(c) * * * Each sign bearing a trademark or trade name of the Company which is located at a place of business of the Dealer, * * *

(d) * * * All tools and mechanical equipment owned by the Dealer, * * *."

Paragraph 22 of the Dealer's Agreement provides that under certain circumstances, Ford shall "aid and assist * * * in disposing of or leasing the premises used by the Dealer in fulfilling and performing his duties, obligations, and responsibilities under this agreement." This means that, under those circumstances, Ford agreed to assist the Dealer to sell the premises at fair market value or to lease them for at least one year at fair rental value; if within 90 days after termination a purchaser or lessee was not found, Ford was obligated to purchase or lease the premises at fair market value.

On October 15, 1963, Fader Co. notified Ford by letter that it (Fader) voluntarily terminated the Dealer's Agreement upon condition that Ford extend rights to Fader under Paragraphs 21 and 22 of the Agreement.

On November 6, 1963, the Chancellor appointed a Receiver for Fader Co.

On November 12, 1963, Ford accepted the termination, and agreed to extend rights to Fader Co. under Paragraphs 21 and 22.

Funds originated from Ford and became payable as follows:

| | | | |
|---|---|---|---|
| 1) | Credits held by Ford for Fader Co. prior to the Receivership | $18,795. | |
| 2) | Parts returned by the Receiver (under Par. 21 and pursuant to Court order) | 24,618. | |
| 3) | Signs returned by the Receiver (under Par. 21 and pursuant to Court order) | 1,000. | $44,413. |

Less: Amounts paid by Ford

| | | | |
|---|---|---|---|
| a) | to Fader's customers | 6,509. | |
| b) | for repairing a Fader vehicle | 106. | |
| c) | expenses attributable to the Receivership | 83. | 6,698. |
| | | | 37,715. |
| 4) | Premises assistance (under Par. 22) | | 12,184. |
| | Total | | $49,899. |

In terms of this arithmetic, the question is: Did C.I.T. (and the Estate as subrogee) have a lien on any of Items (1), (2), (3) or (4) on the date the Receiver was ap-

pointed? The Receiver contends that C.I.T. did not because, amounts owed by Ford for signs and parts returned and for premises assistance (Items 2, 3, 4) were not "payable" to Fader Co. within the meaning of the assignment. Nor, he says, were credits held by Ford for Fader prior to the receivership (Item 1) subject to a perfected lien at the time he was appointed. The Receiver argues that to perfect the lien, C.I.T. would have had to collect the amount due, or to reduce the potentially lienable fund to a fixed amount.

The Estate contends that in equity acts of perfection are not required for a lien to attach to future advances, so long as the fund assigned is sufficiently identified.

(1) *As to Items 2, 3 and 4:*

█ Equity will support the assignment of a fund not yet in existence, 6 C.J.S. Assignments § 58, but an equitable lien upon a fund which may arise in the future does not attach or become operative, until the assignor obtains rights in such fund. 4 Pomeroy's Equity Jurisprudence (5 Ed.) § 1283; 6 Am.Jur.2d, Assignments, §§ 15, 16; 53 C.J.S. Liens § 7(b); 1 Jones on Liens (3 Ed.) § 42; Burke v. Hoffman, 28 N.J. 467, 147 A.2d 44, 48–49 (1958); Michigan Chandelier Co. v. Morse, 297 Mich. 41, 297 N.W. 64, 66 (1941); Interstate Finance Corporation v. Dodson, 105 Ind.App. 513, 12 N.E.2d 989, 991 (1938). And see the Restatement of Contracts § 154(2) and § 156. Compare Hoffmann v. Barnett, 198 Okl. 335, 178 P.2d 89 (Okl. 1946).

As stated by the Indiana Appellate Court in *Interstate Finance Corp.*:

" 'Personal property and choses in action to be acquired in the future under a valid contract may be assigned, and such assignments * * * are recognized and enforced in equity * * * Where the subject of an equitable assignment is money to be earned in the future * * * by the performance of a contract, such assignment does not become operative until * * * *something has become payable* under the contract. Nothing can be claimed under such an assignment until conditions have arisen which would have enabled the *assignor* to assert a claim successfully in the absence of such assignment.' " (Emphasis in the opinion.)

The New Jersey Supreme Court put it this way in *Burke*:

"An equitable assignment of 'money to be earned' becomes operative 'upon the fund as soon as it [is] earned'. * * * There could not be in the nature of things a positive lien or charge upon a fund not *in esse*."

And Pomeroy states that an order as to a fund not yet in existence "will operate as an equitable assignment of such fund as soon as it is acquired." § 1283.[3]

The Estate argued that the Receiver took title to all of Fader Assets subject to "any valid prior liens thereon or assignments thereof." This argument is not directed to the crucial question, which is whether the Fader Co. assets *were* subject to a valid prior lien. Hence the Estate's cases are not relevant.

3. Compare the Delaware statutory law. Under 6 Del.C. § 1802 (prior to July 1, 1967), an assignment of an "account" was perfected at the time it was made, provided certain conditions not applicable here, were fulfilled. But, a requirement of 6 Del.C. § 1801 was that the account be "receivable," which included "sums owing, although not yet payable, under an existing contract, * * *." And the Uniform Commercial Code, 5A Del.C. § 9–204, provides that a security interest cannot attach until the assignor has "rights in the collateral." An assignor can obtain no rights in a contract right until the contract has been made, or in an account "until it comes into existence." § 9–204(2) (c, d).

The key question is whether C.I.T. had an equitably cognizable right before the Receiver was appointed in the funds now identified as Items 2, 3 and 4. As to this, the answer must be in the negative. The most that can be said is that C.I.T. had a contract right to receive moneys payable to Fader Co. in the future. But such a right is not enforceable here because (a) such money was never payable to Fader Co.; (b) neither such moneys nor a "fund" nor a "credit" of any kind was in existence when the Receiver was appointed. Moreover, C.I.T. did not have a contract right to require Fader Co. or the Receiver to return vehicles, parts or signs to Ford. On the contrary, the option to purchase (and so to incur obligations to pay for them) belonged to *Ford*. Thus, equitably, C.I.T. had no right to require the Receiver to apply the vehicles, parts and signs in such a way that moneys would become payable to the Receiver (or Fader) by the factory (Ford).

It follows that on November 6, 1963 Fader Co., the assignor, had no rights in funds designated here as Items 2, 3 and 4, and hence C.I.T., as assignee, held no lien with respect to those items.

(2) *As to Item 1*:

At the time the Receiver was appointed, Ford held $18,795 of credits for Fader Co. The Receiver contends that this amount could not have been assigned until collection was made or until some step was taken to calculate the amount owed to Fader Co.

But it was money payable to Fader Co. by the factory, Ford, within the language of the agreement, and it meets both the common law and statutory requirements to which I have referred. In short, the assignor (Fader Co.) had rights in that fund, it had been "earned" and was therefore payable to Fader Co. before the Receiver was appointed. I agree with C.I.T.'s contention as to this Item.

(3) *As to allocation*:

To arrive at the $49,899 figure representing the net credits, certain disbursements were taken into account. As shown previously, total disbursements amounted to $6,698, broken down as follows:

| | |
|---|---:|
| —Refunds by Ford to Fader Co. Customers: | $6,509. |
| —Cost to Ford for repair of a Fader Co. Vehicle: | 106. |
| —Ford expenses in connection with Return of Parts: | 83. |
| Total Disbursements | $6,698. |

The total of credits held by Ford ($56,598), less these disbursements, left the net figure of $49,899.

The question is whether all or some of the disbursements should be allocated to the "lienable" amount of $18,795, which represents credits on hand prior to the receivership. The Receiver contends that all but $83.10 should be so allocated, leaving a net figure of approximately $12,189 as as the liened amount, but he suggests no persuasive reason for that result. On the contrary, it seems unreasonable to allocate as the Receiver suggests. None of the expenses involved are related to, or were incurred to earn, the $18,795 worth of credits which existed prior to the receivership. Most of them arose from refunds to Fader Co. customers, a matter which in its

nature relates rather to the receivership as a whole. C.I.T. bargained for and got a claim to all moneys payable to Fader Co. by Ford, and to now charge it with these expenses seems inequitable. In effect, I think they should be spread through the receivership estate. I conclude that none of the expenses will be allocated to reduce the "lienable" amount.

(4) *The effect of the lien:*

 The Estate's claim is for $106,-000 and it contends that it is entitled to a pro rata share of assets based on this amount without reference to any amounts which it may realize as a result of the equitable lien position it has asserted. The Receiver opposes this application but tacitly seems to concede that the law supports the Estate's position. The question is not dealt with at all in the Receiver's brief, nor do I recall any discussion by him of the law at oral argument.

The general rule seems to be that "in a receivership a secured creditor may prove and receive dividends upon the face of his claim as it stood at the time of the appointment of the receiver, * * * without crediting either his collaterals or collections made thereupon, provided, of course, that dividends must cease when the claim has been paid in full." 45 Am.Jur., Receivers, § 253. Delaware law is to the same effect. Mark v. American Brick Mfg. Co., 1912, 10 Del.Ch. 58, 84 A. 887; Central Nat. Bank v. Bateman & Companies, Inc., 1925, 15 Del.Ch. 31, 131 A. 202. Hence I conclude that the Estate is entitled to share on a pro rata basis based upon the face amount of its claim of $106,000.

(5) *Interest and attorney fees:*

 The Estate seeks to recover for payments made on C.I.T.'s claim for interest and attorney fees, but it neither briefed nor argued the question, so I conclude that this part of the claim has been abandoned.